Filed 2/2/24  P. v. Yu CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C096075 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-166376) |
| v. | |
| ANTHONY YU, | |
| Defendant and Appellant. | |

Defendant Anthony Yu was found guilty of 15 counts of physically and sexually abusing his two children, six counts of dissuading them from reporting the abuse or assisting in its prosecution, and two counts of violating a court order not to contact them. He argues his convictions on *all* counts must be reversed because:  (1) his right to represent himself during the pretrial period was violated because he was denied adequate resources to prepare his defense; (2) the trial court abused its discretion by denying his midtrial motion to discharge his retained counsel and represent himself again; and (3) the

1

trial court erred in admitting testimony from two prior girlfriends, one of whom is the mother of the two children, about other acts of physical and sexual abuse. We disagree.

Defendant also argues his conviction on two counts of dissuading a witness must be reversed because of insufficient evidence, and the matter must be remanded to the trial court to exercise its discretion under Penal Code section 654 to stay the sentence on either the attempted torture conviction or four other convictions that make up the conduct constituting his attempted torture conviction. We agree. We thus affirm the judgment on all but two counts and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

Except for two counts of dissuading a witness, defendant does *not* challenge the sufficiency of the evidence to support any of his other 21 convictions, and we thus do not discuss the evidence underlying those convictions in detail. Instead, we summarize only the evidence that is relevant to the arguments defendant makes on appeal.

Defendant has two children with his former girlfriend T.W.—a daughter born in 2004 and a son born in 2006. In approximately 2007, defendant became the sole parent of the children after their mother left. In 2008, defendant and the children moved into the home of defendant's parents in Rancho Cordova. They lived there for about eight years. Two of the counts for lewd acts on a child occurred while defendant lived with his children at his parents' house.

Defendant and the children shared a bedroom the entire time they lived with his parents. All three initially slept in the same bed. At some point, the children's grandparents bought them a bunk bed. Defendant's son testified his grandparents wanted to put the bunk bed in a separate bedroom, but defendant insisted it be put in his bedroom. Defendant's daughter testified that, after the bunk beds were purchased, she still slept in defendant's bed "[e]very once in a while." She also testified when she was between seven and 11 years old defendant touched her breasts and she "felt it was inappropriate, especially because [she] was growing" and she "didn't feel comfortable

2

with it whatsoever." She testified that, once a month while living at her grandparents' house, defendant would touch her breasts under her clothes and her butt over her clothes. Defendant's son remembered that, also during this time, defendant dragged him out of bed by his hair and slammed him on the ground. Defendant's daughter said that, while living with her grandparents, defendant hit her and her brother "upside the head," and she remembered one incident where he threw her brother across the room.

In January 2016, defendant and the children moved out of his parents' house. Defendant's daughter testified the physical abuse "got worse when [they] moved out to [their] own home. There was no supervision [there] or there was [*sic*] no grandparents to tell him no," and "[they] would be hit harder or for longer periods of time." About six months after moving, the children were removed from the home after a neighbor saw bruises on defendant's daughter's arms and she told the neighbor defendant hit her and her brother. The children were placed in foster care for several months and then lived with their grandparents until they were returned to defendant in March of 2017. The events that triggered the removal are not directly at issue in this case, however one count of lewd acts with a child occurred during the first six months after the family moved. Defendant's daughter testified that defendant continued to touch her in the same way he had when living at her grandparents' house—on her breasts and her butt. She also described an incident where she was sitting next to defendant and "he put his hand between [her] legs and rested it between [her] thighs, and [she] tried to scoot away because it . . . was too close for how [she] felt comfortable, and he asked [her] why [she] had scooted away." She clarified defendant touched her on the "vagina," over her clothes. She did not feel she could say no because they were not allowed to say no.

All of the allegations of physical abuse and the two remaining allegations of sexual abuse occurred after the children were returned to defendant in March of 2017. The children were physically and socially isolated. They were homeschooled and had no direct contact with other kids in the homeschool program. They had no extracurricular

activities. They were not allowed to go outside except for to complete household tasks, such as taking out the trash or going to the grocery store. Defendant's daughter testified, "I was not allowed to have friends." Defendant's son testified they had "no school life," "no social life," and had to spend many days just "sitting in [their] chairs doing work" for "eight to fourteen hours."[1]

Defendant was controlling. He made his son do "guard duty" as often as two or three times a week, which involved standing outside defendant's bedroom at night "to protect the family and to learn how to stay focused." If defendant's son fell asleep, defendant would get angry and kick or slap him to wake him up. The children had to call defendant "daddy." "[They] couldn't call him dad, father, [and] definitely not Anthony. He would be really, really mad if [they] did." They had to repeatedly apologize if they did something wrong, and say, "Yes, Daddy. I'm sorry, Daddy," a specified number of times (sometimes into the thousands) and start over if they made a mistake. They were not allowed to eat until defendant ate or he gave them permission to eat. Sometimes they were not allowed to sleep in their own bedrooms and had to sleep on the floor in defendant's bedroom. Defendant's daughter testified defendant once threatened to ground her if she did not sleep in his bedroom. Defendant would sometimes "lock" the children in his closet by threatening them if they left. Defendant's daughter said she "felt" locked in because she "believed that, if [they] were to get out of the closet, [they] would be punished."

The physical abuse escalated. Defendant's son testified that one time defendant got mad at him for watching YouTube videos without permission and "he threw [his son's] desk at [him]." Another time he was playing with LEGOs without permission and

---

[1]     Defendant testified that after his children were returned to him, he developed a "circling the wagon sort of mentality" and "became leery of letting [the] kids go outside," and he thus "kept them close."

defendant "kicked [him] in the face," which caused his eye to swell shut for a week. Both children described an incident where defendant kicked his daughter in the face while she was wearing an orthodontic mask. Both children described being hit by defendant with his fists, a belt, and a broom, and being stomped in the head. The beatings would happen as often as "two or three times a week." Defendant's son testified it seemed like defendant "enjoyed" abusing them and "got a feeling of power" and "a feeling of control" from it. Defendant's daughter testified defendant would not allow their grandparents to visit when they had visible injuries.

Defendant's daughter testified defendant continued to touch her body in ways that made her uncomfortable. Defendant would make both children turn around and he would "kick [them] . . . in the backside." Although he treated it as a joke, defendant's daughter "didn't feel comfortable with that." She testified defendant continued to touch her butt "once or twice a month or once a month," and would say things like, "I'm the only one allowed to touch your butt." She testified defendant would ask her "to spread [her] legs" and he would kick her "in between [her] legs, not hard, but it was definitely uncomfortable." Defendant appeared to treat it as a joke, but she "felt violated. It wasn't something [she] was very comfortable with, whether it was a joke or not." When asked if it seemed "like a sexual sort of thing," she responded, "In a way, yes, it did." She also testified she would sometimes sit on defendant's lap and he would get "too close to private areas and . . . [she] didn't feel comfortable sitting with him anymore." By private areas, she explained she meant her vagina. She testified she would sit on defendant's lap once or twice a week, and "almost every time" he would "touch or come too close to [her] private parts." She said this made her feel "uncomfortable. [She] didn't feel like [the house] was a safe place for [her] anymore. [She] used to love sitting with [her] father and being able to have a relationship with him and just bond as a family, but eventually over time, it just felt very uncomfortable and wrong in [her] head." She did not feel she could tell defendant no because "that would be one of the reasons why [they]

5

would be grounded again or hurt."**2**

In early February, what might be described as the beginning of the end was triggered by what the prosecutor referred to as the Wattpad incident. The children had created accounts on social media platforms without defendant's knowledge or permission, including a story sharing site called Wattpad. Defendant found out somehow and got "very angry." Defendant's son testified defendant yelled at them for hours, smashed his laptop, kicked him while he was on the ground and stomped on his head, and hit both children with a metal bar from a coat rack. He said his sister was "huddled" against a wall "trying to protect herself" and was crying and hyperventilating. Defendant's daughter testified defendant hit, kicked, and stomped her brother for two hours, and her brother was crying and there were bruises on his forearms. Defendant demanded the passwords to his daughter's social media accounts, and when she did not immediately provide them, he hit her until she did. At one point he got a "pole from the coat rack" and hit her with it for "[p]robably ten minutes." She had bruises and scratches on her forearms and she could not feel her hands.

Defendant's daughter testified defendant also threatened her with a steak knife during the incident. She explained he "ask[ed] [her] for the passwords for [her] social media," and when she denied she had more accounts he "went to the kitchen and grabbed a steak knife and pointed it at [her] while [she] was on the ground and told [her she] need[ed] to tell him whether there were any other online accounts." He "chased [her]

_____

**2** Defendant testified he "[n]ever, never, never, never" sexually assaulted his daughter and he never put his hand down her pants. When asked if he ever put his hands up her shirt, he responded, "Maybe when she was six, seven years old." He later explained, "That's just what happens when you have two kids in the bed six, seven years old. So if I'm cuddling with my daughter or my son or whatever that night, I'm sure that could have happened, but there was nothing even remotely lascivious about it."

through the hallway [and] into the dining room" with a knife in his hands. She was "on the ground scooting away from him."

As punishment for the Wattpad incident, defendant made the children sit on the floor wearing only their underwear for several days. They were not allowed to do anything while they sat. Defendant's son testified they were not allowed to use the bathroom while they sat, and defendant's daughter testified they had to ask permission to use the bathroom.

Defendant's daughter testified she got depressed sitting on the floor, she felt "hopeless" and "sad" because she would not be able to speak to her online friends again, and she engaged in "self-harm" by cutting her arms. Defendant's son described his sister as suicidal and confirmed she started cutting her arms (although he was not sure whether the cutting occurred before or after the Wattpad incident). He testified that, when defendant discovered the cutting, defendant "threatened to cut her himself with one of [their] kitchen knives," and "kept threatening her that if she d[id] it again he'[d] slit her throat."

Defendant's son testified that, around this time, "[he] was starting to be really afraid that [he] was going to die and . . . [he] wanted a different life." Defendant's daughter had similar feelings, testifying she felt "trapped" and "wanted to be safe." She was scared "[her] father would go too far and he would, whether on purpose or not, kill [them]." They came up with a plan to call the police and report the abuse.

Several days after the Wattpad incident, defendant's son called 911 and said he and his sister had been hit by defendant. A police officer came to the house, but defendant would not allow him to speak to the children.[3]

---

[3]    When asked why he did not let the officer speak to the children, defendant testified that as a result of the first removal, he had "learned from experience that law enforcement isn't always the good guy."

The next day, the police returned with a child welfare worker who talked to both children. Before the children went outside to talk to her, defendant instructed them to "cover every inch of [their] bodies" and told them, "[D]on't say anything, just say I want to stay with my dad." The children followed defendant's instructions. The child welfare worker tried to speak to each child separately, but they kept repeating, "I don't want to talk to you. I want to go back in with my dad." She testified she was struck by the children's physical appearance, and said they "looked pretty malnourished and neglected," but she "couldn't see any obvious signs of physical abuse."

Over the next several weeks, the children called 911 many times but hung up without saying anything. Defendant's daughter explained they didn't say anything when they called 911 because they thought defendant had installed a recording device on the phone.

Things came to a head on or about March 2, 2019. That day, defendant's son "had gotten in trouble for something" and defendant was yelling at him, and defendant's daughter was afraid he was going to hurt her brother. She dialed 911 and, although she did not say anything, she "hope[d] that somebody would hear . . . that . . . [her] brother was being yelled at." The police showed up later that day, the children were removed from the home, and defendant was arrested some time thereafter.

Defendant's daughter testified that, after defendant was arrested, and at his direction, she called his lawyer and took back the sexual abuse allegations because she "was told they were more serious and that they would land him in jail for longer time." She also spoke to a defense investigator who she thought tried to get her to say she had just misunderstood her father's touching of her. After the conversation with the defense investigator, defendant's daughter "changed a lot of [her] words to sound as if [she] was lying or just . . . misunderstanding," but she had felt "as if [she] was being coerced" into doing so.

8

The jury found defendant guilty of one count of attempted torture, two counts of assault with a deadly weapon or likely to produce great bodily injury, two counts of criminal threats, two counts of felony and two counts of misdemeanor child abuse, one count of false imprisonment, six counts of dissuading and attempting to dissuade a witness, two counts of violating a court order not to contact his children, two counts of lewd or lascivious acts on a child under 14, and three counts of forcible lewd or lascivious acts on a child under 14. The jury found defendant not guilty of one count of dissuading a witness and was unable to reach a verdict on three counts of assault with a deadly weapon. The jury found several aggravating circumstances to be true. The trial court sentenced defendant to consecutive terms on each count, totaling 63 years two months.

Defendant appeals.

DISCUSSION

I

*Defendant Has Not Shown Prejudice Related*

*To The Adequacy Of His Pretrial Resources*

A criminal defendant has a constitutional right to proceed without counsel and represent himself when he voluntarily and intelligently elects to do so. (*Faretta v. California* (1974) 422 U.S. 806, 807.) Here, defendant was represented by counsel from approximately June 2019 to August 2020. In September 2020, the trial court granted defendant's *Faretta* motion and permitted him to represent himself. Defendant represented himself for approximately one year, until he retained counsel in September 2021. Retained counsel represented defendant in the approximate four months leading up to and throughout trial, even though defendant attempted to represent himself again during trial. Defendant contends that, during the approximate one-year period he represented himself, he was denied reasonable access to the resources necessary to

9

present a defense, and that, as a result, his entire conviction must be reversed. We disagree.

## A

### *Applicable Law*

A defendant exercising his right to self-representation is entitled to reasonable resources to help him prepare his defense. (*People v. Blair* (2005) 36 Cal.4th 686, 732-733, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) As our Supreme Court explains, "[D]epriving a self-represented defendant of 'all means of presenting a defense' violates the right of self-representation." (*Blair*, at p. 733.) Thus, "a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense [citation], but this general proposition does not dictate the resources that must be available to defendants." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1040.) Instead, the adequacy of those resources—which we will refer to as defense resources—is reviewed under a rule of reasonableness. "[T]he Sixth Amendment requires only that a self-represented defendant's access to the resources necessary to present a defense be reasonable under all the circumstances." (*Blair*, at p. 733.)

"To be entitled to a reversal" in a case where a self-represented defendant claims he was deprived of reasonable access to defense resources, the "defendant must show both error and resulting prejudice." (*People v. James* (2011) 202 Cal.App.4th 323, 335.)

## B

### *Defendant Has Not Demonstrated Prejudice*

In his opening brief, defendant *never addresses prejudice*, much less demonstrates it. In response, the People argue we should reject his claim on this basis. We agree. By failing to even address prejudice, defendant has failed to meet his burden of demonstrating it. And given that defendant retained counsel approximately four months

10

before trial began and retained counsel ultimately represented defendant at trial, we are unable to supply a colorable prejudice argument on our own.

In his reply, defendant argues he is not required to show prejudice, and he complains the People's argument that he is required to show prejudice it based "solely on a footnote in *People v. James* (2011) 202 Cal.App.4th 323, 335, [f]n.[ ]5." The People do not cite footnote 5 of *James*—they cite page 335 of the case, which states: " '[D]epriving a self-represented defendant of "all means of presenting a defense" violates the right of self-representation. [Citation.]' (*People v. Blair*, *supra*, 36 Cal.4th at p. 733.) However, '[i]n the final analysis, the Sixth Amendment requires only that a self-represented defendant's access to the resources necessary to present a defense be reasonable under all the circumstances. [Citation.] [¶] Thus, the crucial question . . . is whether [a defendant] had reasonable access to the ancillary services that were reasonably necessary for his[, her, or their] defense.' (*Id*. at pp. 733-734.) *To be entitled to a reversal, a defendant must show both error and resulting prejudice*. (*Id*. at p. 736.)" (*James*, at p. 335, italics added.) *James* thus supports the People's argument that, in a case such as this where the defendant was permitted to represent himself but claims he was denied reasonable defense resources, reversal is not required unless the defendant shows prejudice.

*People v. Blair*, *supra*, 36 Cal.4th 686 also supports the People's argument. There, a defendant who was permitted to represent himself appealed his conviction, arguing his Sixth Amendment rights were violated because he was denied reasonable access to ancillary defense resources. (*Blair*, at pp. 729, 734.) Our Supreme Court disagreed, finding the defendant "had reasonable access to the ancillary services that were reasonably necessary for his defense" (*id*. at p. 734), and also that, to the extent he was denied access to any particular resource, "the denial was minimal and [the] defendant ha[d] *failed to demonstrate any resulting prejudice*. [The] [d]efendant thus ha[d] not established any violation of his Sixth Amendment right to self-representation" (*id.* at p. 736, italics added).

11

*People v. Jenkins*, *supra*, 22 Cal.4th 900 is similar. The defendant in that case represented himself during the penalty phase of his capital trial, with the help of advisory counsel. (*Id*. at pp. 930, 1033-1034.) On appeal, he argued "he was left bereft of all assistance and unable to contact and interview witnesses due to restrictive conditions of confinement at the county jail and restrictive security measures in the courtroom," and was thus deprived "of all means of presenting a defense." (*Id*. at p. 1040.) Our Supreme Court acknowledged the "defendant's investigator and his sentencing consultant sometimes had difficulty in securing adequate opportunities to speak with [him], . . . the courtroom bailiff prohibited [the] defendant from speaking to his assistants or his witnesses at the courthouse," and the defendant sometimes returned to the county jail too late to telephone witnesses. (*Id*. at p. 1040.) The court also stated, "We do view with concern the [trial] court's refusal to permit [the] defendant to interview an out-of-state expert witness with whom defendant never had spoken—and whom counsel refused to interview—before defendant called him to testify." (*Id*. at p. 1041.) But the court ultimately held, "*Assuming error, however, no prejudice appears . . . .* Accordingly, we reject [the] defendant's contention that he was deprived of the ability [to] act as his own counsel and to put on a defense." (*Ibid*., italics added.)

Accordingly, there is ample support for the People's argument that defendant must show prejudice to prevail on his claim that he was denied reasonable access to defense resources.

Defendant counters that he need not show prejudice because the denial of the right to self-representation is structural error. It is true that the "[e]rroneous denial of a *Faretta* motion is reversible per se." (*People v. Butler* (2009) 47 Cal.4th 814, 824; see also *People v. Aranda* (2012) 55 Cal.4th 342, 363-364 [denial of self-representation constitutes structural error].) Here, however, defendant's *Faretta* motion was not denied, erroneously or otherwise; it was granted, and he was permitted to represent himself. As a

12

result, defendant must demonstrate prejudice and he has failed to do so. Thus, his claim that he was denied reasonable access to defense resources fails.

## II

### *The Trial Court Did Not Err By Denying*
### *Defendant's Midtrial Request To Represent Himself*

### A

### *Factual Background*

As discussed, defendant represented himself for approximately one year, until September 2021, at which time he retained counsel to represent him. Thereafter, extensive motions in limine and other pretrial motions covering numerous topics were filed and ruled upon over the course of approximately five months. Jury selection began on February 9, 2022, and took three full days. From February 15, 2022, through March 1, 2022, the prosecution called numerous witnesses, including both children. Defendant called his first witness on March 2, 2022. After defendant's first witness finished testifying, retained counsel informed the trial court that defendant wanted to make an oral *Faretta* motion. Defendant confirmed he wanted to discharge his retained counsel and represent himself because of counsel's "incompetence" and "a breakdown in communication" between them that defendant said had "existed for quite some time now."[4] The court cleared the courtroom and conducted an in camera proceeding with defendant and his counsel.

Defendant proceeded to explain at length why he wanted to discharge counsel and represent himself. Among other things, he complained his counsel was "extraordinarily

---

[4] Defendant notes in his opening brief that the trial court denied two other requests to discharge his retained counsel and represent himself—one made on February 8, 2022, and the other made on February 28, 2022. He states, however, that his focus is on the March 2, 2022 request, and in his discussion of the relevant facts he cites only the March 2, 2022 request and the trial court's related decision. Thus, to the extent defendant

13

unprepared"; was unfamiliar with the evidence and had to ask defendant what he should ask witnesses; failed to adequately cross-examine and/or impeach many of the prosecution's witnesses, including his children; waited until the eve of trial to walk through all counts in the complaint and get defendant's "version of events"; and erroneously believed "the motions in limine cover more than they . . . actually do" and thus failed to object when the prosecutor was given "carte blanche . . . to disregard the rules of evidence." Defendant alleged his counsel was content "to sit meekly and allow [him] to be convicted and sent off to prison for things that [he] did not do, rather than [provide] a vigorously contested defense."

Retained counsel responded to defendant's criticisms and explained why he had done or not done certain things, and why he believed certain evidence that defendant wanted to introduce was either a "double-edged sword" or was "not good" for the defense or was unlikely to be admitted. The trial court agreed some of the evidence was "not coming in." Counsel also stated defendant only hears "what he wants to hear," and as a result it was sometimes "just easier to try to placate him and say . . . I'm going to let the judge make the decision." Finally, counsel had just listened to a recorded jail call between defendant and his mother in which defendant had apparently complained about him, and counsel stated, "Frankly, after hearing that phone call today . . . I don't believe I can ever have another conversation with this man because he twists things around and turns it to whatever he wants. [¶] . . . [¶] [T]here's clearly . . . a breakdown in communications between me and [defendant], and frankly . . . I have no desire to ever talk to this man again."

_____

seeks to raise claims related to the two previous denials, those claims are forfeited for failing to develop an argument of error. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 ["parties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's [contention] as [forfeited]"].)

14

After listening to both defendant and his retained counsel, the trial court noted most of defendant's complaints about his counsel amounted to tactical disagreements about strategy, which do not by themselves show an irreconcilable conflict. The court then cited to *People v. Lara* (2001) 86 Cal.App.4th 139, 153, and *People v. Ortiz* (1990) 51 Cal.3d 975, 982, pertaining to the timeliness of a *Faretta* motion. After summarizing the relevant law, the trial court noted defendant frequently complained "he hasn't been able to see all the discovery, the videos, all these things that [counsel] has done," and he would thus "need a continuance" if he were to take over his defense, which would "disrupt the orderly process of justice that's unreasonable under the circumstance of this case[,] when, as he points out, it appears that the People are almost ready to rest their case. He can tell me all he wants that he won't want a continuance, but he would be at that point then without adequate representation" because he is not ready to take over his defense. It then denied defendant's request to discharge counsel and represent himself because the request was untimely.

## B

### *Applicable Law*

Defendant's midtrial request to discharge retained counsel and represent himself involves two related bodies of law. First, as a general rule, "[a] criminal defendant has the . . . right to appear and defend with retained counsel of his or her [or their] choice." (*People v. Lara*, *supra*, 86 Cal.App.4th at p. 152.) "In contrast to situations involving appointed counsel, a defendant may discharge his[, her, or their] retained counsel of choice at any time with or without cause." (*Ibid.*) "A nonindigent defendant's right to discharge his[, her, or their] retained counsel, however, is not absolute," and a trial court has "discretion" to deny a motion to discharge retained counsel in certain circumstances. (*People v. Ortiz*, *supra*, 51 Cal.3d at p. 983.) In particular, "A trial court need not permit a defendant to discharge retained counsel where . . . it is untimely and would 'result in . . . "disruption of the orderly processes of justice unreasonable under the circumstances

15

of the particular case." ' " (*People v. Turner* (1992) 7 Cal.App.4th 913, 918.) "[W]e apply an abuse of discretion standard of review to a trial court's denial of a motion to relieve retained counsel." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411 (*Dowdell*).) However, if we find an abuse of discretion, this "constitutes structural error and mandates reversal of the defendant's conviction without requiring a showing of prejudice." (*Id.* at p. 1411.)

The second relevant body of law involves criminal defendants' right to represent themselves. This body of law is applicable because defendant sought not only to discharge his retained counsel, but also to represent himself. "A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently." (*People v. Wright* (2021) 12 Cal.5th 419, 436.) But "[i]f a self-representation motion is untimely, it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed pro se.' " (*Ibid.*, italics omitted; see also *People v. Lynch* (2010) 50 Cal.4th 693, 722 ["we have long held that a self-representation motion may be denied if untimely"], abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610; *People v. Hamilton* (1988) 45 Cal.3d 351, 369 [if a *Faretta* motion was untimely "it was within the court's discretion to grant the request or not"].) A *Faretta* motion made once trial has commenced is untimely. (*People v. Windham* (1977) 19 Cal.3d 121, 128.) "[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he[, she, or they] be permitted to discharge his[, her, or their] attorney and assume the defense himself[, herself, or themselves] shall be addressed to the sound discretion of the court." (*Ibid.*) In exercising its discretion, the court may consider factors such as "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or

16

delay [that] might reasonably be expected to follow the granting of such a motion."
(*Ibid.*)

C

*Defendant's* Faretta *Motion Was Untimely*

As noted, the trial court found defendant's motion was untimely. We agree. A long line of authority holds a *Faretta* motion is untimely unless it is made *before* trial starts. (*People v. Wright*, *supra*, 12 Cal.5th at pp. 432, 437-439 [*Faretta* motion made two days before the first day of trial was untimely]; *People v. Lynch*, *supra*, 50 Cal.4th at p. 722 ["we have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely"]; *People v. Valdez* (2004) 32 Cal.4th 73, 102 [*Faretta* motion made "moments before jury selection was set to begin" deemed untimely]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [self-representation motion made on the date scheduled for trial untimely].) We see no reason a different measure of timeliness would apply in this case because defendant sought not just to represent himself, but also to discharge retained counsel. (See, e.g., *Lynch*, at p. 725 [comparing right to self-representation to right to select counsel of one's choice and noting "[w]e perceive no principled basis on which to . . . accord the defendant seeking self-representation any greater liberty to do so than the defendant seeking to select retained counsel"].) Here, defendant's motion was made several weeks after trial started, and was thus untimely.

Defendant claims his motion was timely because it was made as soon as he realized communications between him and his counsel had broken down.[5] As just noted, however, timeliness is not assessed by when communications broke down, but by whether trial had commenced. Here, trial was well underway when defendant sought to

---

[5]    This is belied by the fact that when defendant made his *Faretta* motion, he stated the "breakdown in communication" had "existed for quite some time now."

17

discharge counsel and represent himself, and his motion was thus untimely for purposes of ruling on that request.

Because the motion was untimely, the trial court had discretion to deny it. We discern no abuse of discretion in the trial court's decision to deny defendant's untimely motion to discharge counsel and represent himself. This case is similar to *Dowdell*, *supra*, 227 Cal.App.4th 1388. As in this case, the trial court in *Dowdell* had spent five days selecting a jury, and the defendant sought to discharge retained counsel "eight days into trial, after the prosecution had already presented the bulk of its evidence." (*Id*. at p. 1412.) The trial court denied the motion, and the appellate court affirmed, concluding there was no abuse of discretion. (*Id*. at p. 1413.) In so holding, the appellate court noted the trial court implicitly and appropriately found granting the motion would require a continuance, which could lead to a loss of too many jurors. (*Id*. at p. 1412.)

So, too, in this case. The parties had spent months litigating pretrial motions. They had spent many days selecting a jury. The prosecution had presented the bulk of its evidence, and defendant had called his first witness. The trial court found that granting defendant's request would require a continuance, and, given defendant's acknowledgement that "to this day" he had not been able to review all of the discovery, this finding is supported by the evidence. In his reply, defendant argues, "[T]he harm from a short continuance would not have outweighed the infringement on [his] constitutional rights caused by forcing him to proceed while represented by a lawyer with whom he had an irreconcilable conflict and a complete breakdown in communication." The trial court found otherwise, and we conclude it acted well within its discretion in doing so.

*Dowdell* is similar to this case in another way. During one of the hearings on the defendant's request to relieve retained counsel, his counsel stated, " 'I have been accused and maligned by my client throughout this whole trial that I am not working for him. I am not doing what he wants, that I am working in cahoots with the [d]istrict [a]ttorney.

18

Your honor, I want to withdraw from this case. I mean it. I can't take this anymore.' " (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1410.) This is similar to retained counsel's statement, "I don't believe I can ever have another conversation with this man because he twists things around and turns it to whatever he wants," and "I have no desire to ever talk to this man again." According to defendant, his counsel's statements conclusively demonstrate they "were unable to communicate in the manner necessary to carry on a constitutionally acceptable attorney-client relationship." As in *Dowdell*, however, we conclude "their conflicts were not so irreconcilable as to warrant" a delay in the proceedings. (*Id.* at p. 1412.) This is particularly true where, as here, our review of the record shows counsel was able to communicate with defendant even after stating, "I have no desire to ever talk to this man again." We also note the trial court had previously noted counsel had done "an admirable job" and had filed some successful motions that had "preclude[d] the prosecution from doing certain things."

For all these reasons, we find no abuse of discretion in the trial court's denial of defendant's midtrial motion to discharge retained counsel and represent himself.

III

*Evidentiary Contentions*

A

*Factual Background*

Before trial, the prosecutor moved to admit testimony from two of defendant's former girlfriends, L.W. and T.W. (who is also the mother of defendant's children). According to the motion, both women would testify defendant used coercive control methods over them for the purposes of obtaining sexual compliance and that his behavior escalated into sexual abuse; used sex as a form of control and sadistic release; subjected them to physical and emotional abuse that is similar to the abuse he inflicted on his children; isolated them from friends and family as a means of control, as he did with his children; and talked about wanting a family that had sex together. The prosecutor further

19

proffered that L.W. would testify defendant viewed child pornography. The prosecutor also sought to admit several videos of defendant and T.W.; some videos would be shown to the jury, and some (the more sexually explicit ones) would be described by an investigator who had viewed them. The prosecutor argued this evidence was admissible pursuant to Evidence Code[6] sections 1101, 1108, and 1109.

Defendant opposed the motions, arguing the evidence concerned conduct that was too dissimilar to the crimes at issue to be relevant. He argued L.W. and T.W. were adults with whom he had consensual sexual relationships, he was never charged with any crimes against them, and the conduct occurred 10 to 20 years earlier. He also argued the probative value of the evidence was greatly outweighed by its prejudicial effect, and it should be excluded under section 352.

The parties discussed the motions during a pretrial hearing on February 8, 2022. The court granted the motions, although it stated, "[I]t's without prejudice because trials are dynamic, as we know. They are ever-changing, and there could be something that comes out for us to revisit this if we need to." In granting the motions, the court stated it had considered "various factors, including the nature, the relevance, including possible remoteness, the degree of certainty of its commission, likelihood of confusing or misleading the jury, all of those various mechanical factors, or distracting the jurors from the main inquiry, its similarity to the charged offenses, [and] prejudicial impact on the jury." It noted defendant's "repeated use of control, confinement, isolation, all of those things are relevant to the crimes committed against [defendant's children]." Finally, it noted the videos show "a longstanding history of . . . defendant's intent, his motive, plan, his preferences, opportunity, knowledge, absence of mistake, methods of operation, how

---

[6]     Further undesignated section references are to the Evidence Code.

20

he consistently employs and commits sexual, physical, [and] psychological abuse on all of the people who have become his victims."

L.W. testified she met defendant in an online chat room in October 1996 when they were both 18 years old. L.W. had "never had a boyfriend before," and initially their relationship was "exciting."

Before L.W. moved in with defendant, he had talked about having a relationship where "he would be the master, [L.W.] would be the slave," but it was "not necessarily a sexual relationship, . . . more of a you take care of me, I'll take care of you." Very quickly after they moved in together, however, things progressed and she had to "do what he sa[id]" and follow "the rules." She explained, "[T]he rules apply to everything, and the rules are that he's the master and you're the slave and everything he says go[es]. You do what he says. You . . . like what he likes. You love how he loves."

Defendant socially isolated and controlled L.W. She had been a "straight-A student" in high school, but defendant thought high school was a "waste" and did not support her studies. L.W. eventually dropped out of high school. Defendant would not let L.W. talk to her family. She had a job for a short time but was fired after an argument with defendant where he would not let her go to or call into work. She had to stay inside and could not go outside unless defendant gave her permission to do so. Defendant made L.W. drive him to work and sit in the car all day. She had to call him "master" and was not allowed to use his name. She had to kneel next to him, sometimes unclothed, "not doing anything, just sit[ting] there like a dog."

If L.W. did not do exactly what defendant said, he would punish her. Punishments included "physical violence, physical hitting or . . . slapping" and eventually included "full-on physical abuse." He would pull her around by the hair, hit her with a belt, and make her "sit on the ground and get beat[en] with a wire hanger." Other punishments included having to stand at the end of the bed while defendant slept; if she sat down or fell asleep, he would hit her. Sometimes he would order her to go into the closet and face

21

the wall. One time he locked her in the bathroom for "at least 24 hours," and she was going "crazy" and ended up trying to kill herself by taking sleeping pills. When she told defendant she had taken sleeping pills he got "really angry" and yelled at her that she was stupid.

L.W. testified that she did not always consent to having sex with defendant, but she never said "no" because "it was like [she] couldn't say no. [She] couldn't say [she] [didn]'t want to do such and such thing." She testified, "He liked anal sex," and, "if he wanted anal sex, then I had . . . to give myself an enema and make sure everything was perfect." He would make her say her body belonged to him and, "I'm yours, mind, body, and soul . . . and literally . . . I would have to show him that my body [was] his through sex or the hitting."

L.W. testified she had to look for other girls (preferably virgins) on the computer because "it was his plan to have multiple slaves." She also testified defendant's "plan was to have children, and . . . all have sex together. And he talked about his son would have sex with his daughter. And the way he talked about it was like, isn't this cool, wouldn't this be so nice, . . . this is what would be a happy family."

Defendant made L.W. search for pornography on the computer, including child pornography. She estimated about 15 percent of the pornography defendant watched involved children. He made her watch pornography with him, sometimes while engaging in sex acts. She described one video involving "an older boy and this younger girl, and the older boy was like 14 and the girl was like 6, and [she] remember[ed] [defendant] saying how almost, like, that was sweet or that she's introduced to it by family." She would also look for pornography involving "anal gaping," i.e., expanding the anus, because he liked anal sex. She testified he also liked "mother-daughter stuff."

L.W. tried to "escape" at least once. She ended up at her father's house, who called the police. The police took pictures of her injuries, including bruises, markings from a wire hanger, and black eyes. Ultimately, however, she reconciled with defendant

and moved back in with him. After this, "he made it absolutely clear that everything that happened to him with the cops was [her] fault and that [she] would have to pay for it, and [she] heard it over and over again."

L.W. testified that, in the end, "[she] had no friends. [She] had no family. . . . And [she] had no job. [She] dropped out of school. [She] had no future. [She] had . . . nothing." Their relationship ended in 2000. She testified she had posttraumatic stress disorder from the relationship, and she became very upset when the district attorney's office contacted her about the case.

T.W. testified she met defendant in an online chat room in October 2003. She was 18 years old, and he was 25 years old. They met in person about a week later, and she moved in with him almost immediately. About a week and a half after T.W. met defendant, he talked about them having a master-slave relationship. She testified, "[H]e wanted to be physically violent during sex and was like, [']Well, I'm this way, so I want you to be this way,['] and . . . it just went from there. I didn't have any kind of say or anything."

She had to call him master and was not allowed to call him by his name; she had to walk behind him; she was not allowed to wear clothing in the house; she had to serve him sexually whenever he wanted and "be ready . . . at all times"; and she had to let him hit her during sex. "[H]e told [her] the harder he hit [her] and the more often he hit [her], the more he loved [her]." She was not allowed to have a job, to see her family, or to have friends. She had to ask permission to leave the house and "to breathe." For a short period of time she had to drive him to work and "sit in the car in the garage . . . just waiting the whole time."

She would be punished if she "didn't do exactly as he said." Physical punishments included "all-out punching and kicking [her] in [her] head and [her] body." During the last few months of the relationship, defendant would make T.W. get down on her knees half a dozen times a day, and would say, "Get on your knees, it's time to get

23

hit, and [she] would have to, and then he would punch [her] like [she] was a man. And [she] wasn't allowed to cry. [She] wasn't allowed to do anything but smile and thank him." Sometimes he would make her stand in a closet or against a wall while he slept. He would make her apologize "tens of thousands of times," and "if [she] didn't do as many repetitions that [she] was told to do properly the first time, [she] would have to start from scratch."

T.W. and defendant moved to Ohio in mid-2004, which is where their daughter was born, and they moved to Nebraska in 2006, which is where their son was born. At one point while living in Ohio, T.W. left and went to a domestic violence shelter for several weeks. She ultimately went back to defendant, and "he beat [her] to a living pulp the next morning for about two hours, cut off all [her] hair," and "tried to stab [her]." Defendant also did not allow her to sleep in the bed with him and their daughter, and instead made her sleep on the floor without a pillow, blanket, or clothes. She testified about one occasion where the three of them were in the bedroom and their daughter wanted to sleep on the floor with her mom. Defendant said, "No, you have to sleep in bed with Dad." When their daughter got upset and started crying, defendant got "mad at her and told her, [']Well, if you want to sleep on the floor, then you need to go sleep in the corner.['] " He took their daughter's teddy bear away and "she just sat there crying," and T.W. "wasn't allowed near her to comfort her."

T.W. did not feel she could say no when defendant wanted sex because "he would have just done it anyway. Raping [her] was his middle name. He . . . would do it in front of [her] children to show them. . . . He's like, I'm teaching them how life is. This is what needs to happen. This is the way, you know, I'm teaching them to be them." "[She] still ha[d] the scar on [her] wrist [from] when he zip-tied [her] behind [her] back and anally raped [her] in [her] bedroom. No wasn't in [her] vocabulary ever. It wasn't allowed to be." "[H]is favorite thing[] to do to get himself off was to [strangle] [her] until [she] passed out and be very violent, punching [her] and slapping [her]."

24

T.W. testified defendant had an "extremely large" pornography collection and would sometimes watch child pornography while she performed oral sex on him. She knew it was child pornography because he made her watch it, and she saw "[v]ery young children just unclothed." The children looked "between eight and ten [years old]," and they were "fondling each other" and "there w[ere] some brother-sister-type things." He told her "he wanted to raise his daughters to be his sex slaves and his sons to be like him, and he wanted his daughters having his children as early as 11 years old."

She testified she became very depressed, attempted suicide, and "checked [her]self into more hospitals than [she] c[ould] count." She once attempted suicide by taking "about a hundred Tylenol and Benadryl," and when she told defendant he said, "I'm going to let you die in the gutter now."

Defendant would also have T.W. "make videos or write letters discrediting [her]self, saying that [she] was just crazy" or that she was lying. He followed her around with a video camera "telling [her] how crazy [she] [was] and he need[ed] the whole world to see it." He would make her apologize on camera and "repeat, 'I'm sorry, master' as many times as [she] had to, as many times as he told [her] to." When the district attorney showed her the videos, she "had a nervous breakdown so bad [she] was psychotic for four months."

T.W. testified that one of the reasons she stayed with defendant so long was "because [she] did not want him touching [her] daughter. He wanted to start hurting her at three. He wanted her drinking bottles of his cum when she was a baby." Ultimately, however, T.W. left defendant. The last time she saw the children was when her daughter was around three and a half years old, and her son was under two years old.

Several videos of defendant and T.W. were shown to the jury. Although we have not been provided with copies of the videos, we have been provided with transcripts. According to the transcripts, in one video defendant says he's trying to "document" T.W.'s "mood swings and how dangerous they get." In another video, T.W. says when

25

she "freaks out" defendant has permission to lock her in a room, restrain her, and knock her out. In another video, T.W. says multiple times that she wants "one small glass of champagne," and defendant repeatedly responds that she should not mix alcohol with her medications, and she is "mentally unstable," and "this needs to be documented." T.W. repeatedly tells defendant to turn the video camera off and that she wants to end the relationship. In another video T.W. says, "I can't go forward with compulsive lying. I need to get help." She tells defendant she will tell her doctors "that [her] bipolar has been getting pretty bad lately" and "that [she's] a compulsive liar, and [she] can't seem to stop." Another video begins with defendant saying, "She's willing to throw away her entire family over wanting to go to the grocery store and get fruit," and she "is freaking out again, completely irrational." In that video and another video T.W. says multiple times that she just wants to go to the store, and defendant repeatedly responds that something is wrong with T.W., she is out of control, and he needs to document it. T.W. asks him several times to turn the camera off. Defendant's daughter is visible in some of the videos.

Several videos were described by a district attorney investigator, but were not shown to the jury. The investigator described one as a "homemade sex video," and testified, "At one point in the video, [defendant] is having anal sex with her pretty vigorously, and his penis comes out of her anus. She says, 'I'm sorry, master,' and he slaps her several times across the face." In another video, T.W. is in the bathroom naked, wearing something that looks like a dog collar, and repeating " 'I'm sorry, master' " and " 'I love you, master.' " The investigator described several other "apology video[s]." In one, T.W. is "taking back the accusations that she's made." In another, T.W. "says [that] when she's in a cycle of victimization" she reports that defendant beats her, rapes her, molests their daughter, and watches "kiddy porn," but she is lying when she says these things. In the final video, T.W. is naked and the camera is "zoomed in on her rectal area, and she uses her fingers to show her anus" and uses the term "gaping." T.W. complains

26

she cannot gape for defendant yet, and she says, "I can't wait for our daughter's ass to gape for you," and "[I] can't wait for him to fuck his daughters in the ass." The investigator testified that it appeared some of the sex shown in the videos was not consensual because T.W. appeared "robotic," was not participating, and was "kind of laying [*sic*] there and listening to what he said." In another part of the video T.W. "looks like she's in excruciating pain," and in another the look on her face "is almost one of horror" and "shock," but afterward she said, "Thank you, master."

B

*Applicable Law*

Section 1101, subdivision (a) states the general rule: "[E]vidence of a person's character or a trait of his or her [or their] character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her [or their] conduct) is inadmissible when offered to prove his or her [or their] conduct on a specified occasion." Pursuant to this rule, evidence that a defendant committed "other crimes, civil wrongs or bad acts" is inadmissible to show a predisposition or propensity to commit such acts. (*People v. Cage* (2015) 62 Cal.4th 256, 273; see also *People v. Megown* (2018) 28 Cal.App.5th 157, 163.) "The purpose of this rule is to avoid placing an accused in the position of defending against crimes for which he has not been charged and to avoid having a jury convict him on prejudicial character evidence alone." (*Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 430.) "[T]he rationale for excluding such evidence is not that it lacks probative value, but that it is too relevant." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 179.)

Notwithstanding the general rule, section 1101, subdivision (b) (section 1101(b)) specifies that evidence of other crimes, wrongs, or bad acts is admissible "when relevant to prove some fact . . . other than [the defendant's] disposition to commit such an act," "such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident." However, "[b]ecause evidence of a defendant's commission of

27

other crimes, wrongs, or bad acts ' "may be highly inflammatory, its admissibility should be scrutinized with great care." ' " (*People v. Cage*, *supra*, 62 Cal.4th at p. 273; see also *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*) ["Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis' "].)

The general rule prohibiting propensity evidence is subject to two exceptions that are relevant here. Section 1108, subdivision (a) provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352." Section 1108 thus "allows . . . evidence of prior uncharged sexual offenses to prove propensity." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160.) "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).)

Evidence Code section 1109 contains a nearly identical exception for domestic violence. (Evid. Code, § 1109, subd. (a)(1).) Like Evidence Code section 1108, Evidence Code section 1109 was also enacted for practical reasons. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1028.) A legislative report of the statute stated, " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. . . . Since criminal prosecution is one of the few factors [that] may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal

28

prosecution, or we will miss the opportunity to address this problem at all.' " (*Id.* at pp. 1027-1028.) Unlike Evidence Code section 1108, Evidence Code section 1109 contains the following time limit: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).) It also contains a second, and more stringent, five-year time limit, which will be discussed in more detail below, where the prior domestic violence consists of violence against the defendant's own child. (Evid. Code, § 1109, subd. (d)(3); Fam. Code, § 6211.)

As noted, sections 1108 and 1109 both expressly provide the admission of propensity evidence is subject to section 352, and, although not expressly required, evidence admissible under section 1101(b) is also subject to exclusion under section 352. Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is not unduly prejudicial within the meaning of section 352 merely because it is damaging or " ' "it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490.) Instead, " ' " ' "The 'prejudice' referred to in . . . section 352 applies to evidence [that] uniquely tends to evoke an emotional bias against the defendant as an individual and [that] has very little effect on the issues." ' " ' " (*Scott*, at p. 491.) " '[T]he statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) "In the context of . . . sections 1108 and 1109, a defendant's propensity to commit sexual offenses or domestic violence is not an extraneous factor; it is relevant to the guilt of the accused—and evidence

29

tending to show that propensity has probative value." (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.)

A trial court's ruling admitting evidence is reviewed for abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

C

*Defendant Has Not Demonstrated Prejudicial*

*Error In The Admission Of The Prior Bad Acts Evidence*

Defendant first argues that the challenged evidence is not admissible under sections 1101(b), 1108, or 1109. Alternatively, he argues that even if the evidence was admissible, the trial court should nonetheless have excluded it under section 352. We discuss all four statutes below.

1

*Section 1108*

Like defendant, we begin with Evidence Code section 1108. Defendant was charged with five counts of lewd acts on a child who was under 14 years old, which is a sex offense as defined by Evidence Code section 1108. (Evid. Code, § 1108, subd. (d)(1)(A).) L.W. and T.W. both testified they had nonconsensual sex with defendant, which is included in the definition of rape and/or sodomy, i.e., sexual intercourse or sodomy accomplished against the person's will by means of force or fear, which is also a sex offense as defined by section 1108. (Pen. Code, § 261, subd. (a); Evid. Code, § 1108, subd. (d)(1)(A).) Evidence Code section 1108 thus allows the admission of evidence regarding defendant's commission of sex offenses against L.W. and T.W. to show he has a propensity to commit sex offenses and is thus guilty of committing lewd acts on his daughter, subject to the application of Evidence Code section 352.

Defendant tacitly acknowledges as much when he states section 1108 "does not apply to *most* of the uncharged and charged conduct here because *most* of the uncharged and charged conduct did not consist of sex offenses," and "large portions of the testimony

30

of L.W. and T.W. involved allegations of emotional control, verbal abuse, and physical abuse." (Italics added.) True—but *most* is not *all*, and those portions of the testimony of L.W. and T.W. that *did* involve sex offenses were relevant to the current sex offenses involving defendant's daughter, thus making section 1108 applicable.

Defendant next complains, "[E]ven if section 1108 were a valid theory for a small slice of the uncharged and charged conduct," that "would have required specific jury instructions explaining that only sex-based uncharged conduct was being admitted as to sex-based charges. *No such instructions were given*." (Italics added.) Not so. The jury was given CALCRIM No. 1191A, and "CALCRIM No. 1191 correctly instructs the jury" on how it is permitted to use evidence of uncharged sex offenses when determining a defendant's guilt of charged sex offenses. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 501.) The instructions did not permit the jury to use the uncharged sexual offenses as propensity evidence to prove defendant committed nonsexual offenses.

Defendant next cites *People v. Earle* (2009) 172 Cal.App.4th 372, 399, for the proposition that " 'a propensity to commit one kind of sex act cannot be supposed, without further evidentiary foundation, to demonstrate a propensity to commit a *different act*.' " He argues sexual conduct involving adults does not "demonstrate[] a propensity to touch children in a sexual manner." We disagree.

As we have previously held, "[P]ersons with deviant sexual urges do not always limit their sex crimes to victims of the same age group. Thus, evidence of a defendant's sex offenses against adult women is probative to the question of the defendant's guilt of committing sex crimes against a young girl." (*People v. Escudero* (2010) 183 Cal.App.4th 302, 306.) This is particularly true here because L.W. and T.W. both testified defendant liked and made them watch child pornography and made positive comments about a young girl's introduction to sexual activity by her family, about wanting to have a family that has sex together, and about wanting to raise his daughters

to be his sex slaves. Given this, evidence that defendant raped or sodomized L.W. and T.W. is probative to the question of whether he committed lewd acts on his daughter.

2

*Section 1109*

Defendant argues none of the prior acts evidence against L.W. and T.W. was admissible under section 1109 because it occurred more than five years before the charged offenses. He cites Evidence Code section 1109, subdivision (d)(3), which provides, "Subject to a hearing conducted pursuant to [Evidence Code] [s]ection 352 . . . , 'domestic violence' has the . . . meaning as set forth in [s]ection 6211 of the Family Code, if the act occurred no more than five years before the charged offense."

We need not decide whether defendant is correct because he failed to raise this argument below and has thus forfeited it on appeal. "It is well settled by statute and case authority that the failure to object, even to otherwise inadmissible evidence, [forfeits] the defect." (*Haskell v. Carli* (1987) 195 Cal.App.3d 124, 129 (*Haskell*).) Here, although defendant opposed the prosecutor's motions in limine to admit evidence of prior acts of domestic violence, he did not make the specific argument he makes here. Instead, he argued the trial court should exclude testimony from L.W. and T.W. because "the conduct alleged is between consenting adults, is not criminal, and [he] has never been charged with any crimes" in relation thereto; the probative value of the evidence is outweighed by the prejudicial effect; and "such evidence is time barred under [s]ection 1109, as the alleged conduct occurred more than 10 years ago" for T.W. and "more than 20 years ago" for L.W.

And at the hearing on the motions, he again cited only the ten-year time limit. The prosecutor responded that section 1109 "gives the [c]ourt, in the interest of justice, the ability to go beyond the ten-year period." When the trial court granted the motions it noted "there's a ten-year limit, if you will, on domestic violence," but it had "discretion" to admit the evidence, and it did so. Defendant does *not* challenge this aspect of the trial

32

court's ruling. Accordingly, defendant has forfeited his argument that his prior bad acts were inadmissible because they occurred more than five years before the charged offenses.

3

*Section 1101(b)*

Under section 1101(b), evidence of other bad acts is admissible, not to demonstrate propensity to commit such acts, but as evidence of some other relevant fact like "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident." Here, the trial court cited section 1101(b), and stated the evidence reveals "defendant's intent, his motive, plan, his preferences, opportunity, knowledge, [and] absence of mistake." It also stated the evidence reveals "how [defendant] consistently employs and commits sexual, physical, [and] psychological abuse on all of the people who have become his victims," and showed defendant's "repeated use of control, confinement, [and] isolation[;] all of those things are relevant to the crimes committed against [his children]." Based on these statements, it appears the trial court found "evidence of defendant's prior misconduct [was] relevant to prove a material fact other than defendant's criminal disposition, because the similarity between the circumstances of the prior acts and the charged offenses supports the inference that defendant committed the charged offenses pursuant to the *same design or plan* defendant used to commit the uncharged misconduct." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, italics added.)

Numerous cases recognize "that evidence of uncharged similar misconduct may be employed to establish a common design or plan." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394.) A common design or plan may "be established by evidence reflecting that the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances," and where "the modus operandi of uncharged offenses committed by a defendant is markedly similar to the charged offense." (*Id*. at p. 399.) " 'The presence of

33

a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' [Citation.] For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense. [Citation.] The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] Evidence of a common design or plan, therefore, is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Id.* at 393-394.)

We agree with the trial court's implied finding that evidence of defendant's abuse of L.W. and T.W. was sufficiently similar to his abuse of his children to show he utilized the same modus operandi with all four victims, and it was thus admissible under section 1101(b) to show a common plan or design. For example, defendant physically and socially isolated the two women and his children, which helped facilitate his abuse. Specifically, the children were not allowed to leave the house except to complete household tasks, such as taking out the trash or going to the grocery store, and were precluded from going to traditional schools and participating in extracurricular activities. The children were not allowed to have friends or talk to neighbors. They also had no access to defendant's cell phone and did not have their own phones. L.W. was not allowed outside the home without permission and T.W. had to ask permission to leave the house. When defendant left the house for work, L.W. and T.W. had to drive him to work and sit in the car all day waiting for him. L.W. was not allowed to contact her family, and T.W. was not allowed to contact her family, have friends, or "talk to people." T.W. testified "the phones were locked in a safe."

34

Defendant also subjected the women and the children to similar forms of punishment and control. For example, defendant's son had to perform "guard duty" while defendant slept and, if defendant's son fell asleep, defendant "would slap him to wake up." L.W. had to stand at the foot of defendant's bed while he slept and if she fell asleep he would hit her. T.W. was also made to stand while defendant slept. Further, the children had to sleep on the floor of defendant's bedroom like T.W. was required to sleep on the floor of defendant's bedroom. The children had to sit on the floor in their underwear as a form of punishment and "were told that the only thing [they] could do was sit in those same spots and that [wa]s it." L.W. had to kneel on the floor naked "not doing anything, just sit[ting] there like a dog." The children were "locked" in a closet, like L.W. was made to stand in a closet and locked in the bathroom and T.W. was made to stand in a closet. The children were forced to ritualistically apologize "thousands" of times, as was T.W. Defendant further controlled his children by making them call him "daddy" and not "dad, father, [and] definitely not Anthony. He would be really, really mad if [they] did." L.W. and T.W. had to call defendant "master" and were "not allowed to call him by his name ever." Additionally, when L.W. tried to kill herself defendant got "really angry" and called her "stupid." When T.W. tried to kill herself defendant said, "I'm going to let you die in the gutter." When defendant discovered his daughter was cutting herself, he got angry and threatened to "cut her himself." Finally, when police came to investigate reports of fighting, defendant made L.W. "go talk to them and tell them everything was fine." Defendant made T.W. record videos or write letters discrediting herself and taking back prior accusations. Similarly, defendant told his children not to say anything to police, and after he was arrested told his daughter she had to retract her allegations of abuse and "tell whoever it may be that [she] was lying."

This evidence is sufficient to demonstrate defendant had a consistent modus operandi and specific and unique ways of isolating, controlling, and abusing his victims,

and the evidence was thus admissible under section 1101(b) "to establish a common design or plan." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394.)

There were also other permissible uses for some of the challenged evidence, including to prove motive, intent, and absence of mistake or accident. Defendant argues these uses "are irrelevant to this case" because "there is no suggestion that [he] committed the acts by mistake or accident, or lacked intent; the question is whether he committed the acts at all." We disagree. Defendant was charged with lewd acts on a child under 14 years old, which is defined as willfully touching any part of a child's body "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person." (Pen. Code, § 288, subd. (a).) " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) It is thus *intent* that turns an outwardly innocuous pat on the bottom into a lewd act or an ostensible cuddle into a crime.

Defendant's defense to these charges was that the conduct never occurred, but if the jury believed it did, then defendant lacked the intent required and his daughter misinterpreted the relevant touching. L.W. and T.W both testified defendant had an interest in child pornography, which he watched while engaging in sexual activities, and that he said he thought it was "sweet" that a young girl was introduced to sex by her family. They further testified that defendant said "his plan was to have children and . . . all have sex together" and that "he wanted to raise his daughters to be his sex slaves." This evidence is relevant to show defendant's intent and motive in touching his daughter was sexual rather than innocuous. Indeed, defendant essentially concedes this point when he states, "To the extent some portions of this evidence involved child pornography, [it] may have had limited relevance to show a sexual interest in children." We agree with everything in that statement except his use of the qualifier "limited." This evidence was

relevant to show defendant had a sexual interest in children—period. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 394.)

One final note. Defendant complains the trial court "did not offer specific explanations matching particular uncharged misconduct to particular permissible purposes under section 1101(b)." The defendant in *People v. Thomas* (2023) 14 Cal.5th 327 made a similar argument, and we echo our Supreme Court's response: "Although a more nuanced analysis of the proffered evidence might have been beneficial, it was not incumbent on the trial court to undertake such an endeavor absent a specific objection and request from counsel. . . . 'A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*Id*. at pp. 366-367.)

4

*Section 352*

The final question is whether the challenged evidence—although relevant and admissible under sections 1101(b), 1108, and 1109—should nonetheless have been excluded under section 352, either in whole or in part. This is a harder question, and we do share some of defendant's concerns about the amount of evidence that was admitted. The question on appeal, however, is not whether we would have admitted the evidence had we presided over the trial, but whether the trial court abused its "broad discretion" in doing so. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1175-1176.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Brown* (2016) 245 Cal.App.4th 140, 157.) Defendant fails to convince us the trial court abused its broad discretion in finding the probative value of the evidence was *not* substantially

37

outweighed by the danger of undue prejudice, confusing the issues, or misleading the jury.

When deciding whether to admit evidence of prior sex offenses, domestic violence, or other bad acts under section 352, "trial judges must consider such factors as its nature, relevance, and possible remoteness[;] the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry[;] its similarity to the charged offense[;] its likely prejudicial impact on the jurors[;] the burden on the defendant in defending against the uncharged offense[;] and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense."  (*Falsetta*, *supra*, 21 Cal.4th at p. 917; see also *People v. Disa* (2016) 1 Cal.App.5th 654, 671.)  We address the factors defendant addresses in his brief.

a

*Similarity And Alternatives To Wholesale Admission*

Defendant argues the other acts involving L.W. and T.W. are too dissimilar to the charged crimes to be relevant.  Defendant highlights four specific categories of evidence that he contends are so dissimilar to the charged crimes that they should have been excluded:  (1) evidence defendant had a "master-slave" relationship with "adult romantic partners"; (2) evidence about "adult sexual practices" that are unlike any of the charged crimes; (3) evidence about defendant's "interest in pornography and finding other 'sex slaves' "; and (4) evidence of the physical and psychological impact defendant's conduct had, and continues to have, on the two women.  In a related argument, defendant highlights two additional categories of evidence as particularly objectionable:  (1) the videos of defendant and T.W., which he contends were both unnecessarily graphic and cumulative; and (2) a list of pornographic titles pulled from defendant's computer that a district attorney investigator read into the record for "approximately 16 pages of

38

transcript." Defendant argues the trial court should have considered "less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

We have already addressed the relevance of the challenged evidence and its high probative value. As to the specific evidence defendant addresses, evidence about the master-slave relationship and details about "adult sexual practices," including the videos, was relevant to show the acts L.W. and T.W. described were sex offenses within the meaning of section 1108 rather than consensual sexual conduct between "adult romantic partners." This evidence was also relevant to rebut defendant's testimony that the master-slave aspect of the relationships was "primarily a bedroom thing" and was entirely "consensual." Evidence about the master-slave relationship was also relevant to establish a common design or plan—namely, that defendant perpetrated his abuse by establishing total physical and emotional control over his victims. Evidence about defendant's interest in pornography was relevant because both women's testimony focused on his interest in child pornography and "family incest stuff," and even defendant acknowledges such evidence is relevant to the charged sex offenses. Finally, evidence L.W. had to look for other "sex slaves" was relevant because it was related to defendant's lascivious intent when touching and controlling his daughter.

In addition, some of the evidence about which defendant now complains is outside the scope of the motions in limine, but he never objected to it, and as noted above, "[i]t is well settled by statute and case authority that the failure to object, even to otherwise inadmissible evidence, [forfeits] the defect." (*Haskell*, *supra*, 195 Cal.App.3d at p. 129.) To the extent defendant contends he did not need to "raise any specific objection to particular testimony or pieces of evidence" because he objected globally to *all* of this evidence in his opposition to the motions in limine, we disagree. (*People v. Thomas*, *supra*, 14 Cal.5th at p. 366.) A "general objection" of the type defendant made in

opposition to the motions in limine "is not sufficient to preserve a claim as to specific pieces of evidence." (*Id.* at p. 367.)

For example, the motions in limine sought to introduce evidence of prior sex offenses and acts of domestic violence, and evidence of a common design or plan of abuse. The motions did not seek to introduce evidence of the continuing impact of defendant's abuse on L.W. or T.W. Defendant thus could have objected when the prosecutor asked L.W. and T.W. questions related to the lasting impact of defendant's conduct. He didn't, and thus the issue is forfeited.

As another example, the motions in limine did not address the reading of pornographic titles to the jury. Defendant thus should have objected to this testimony if he wanted it excluded. He didn't, and thus whether "Loving Teenagers With Sodomy 5" or "Mother And Daughter Anal Vacation XXX" should have been excluded is forfeited. (See *Haskell*, *supra*, 195 Cal.App.3d at p. 129.) We also note most of the titles involve either teenagers, daughters, or incest, and this evidence is thus probative given that defendant was charged with lewdly touching his preteen and teenage daughter.

Finally, we reiterate the fact that, when discussing the motions in limine in general, the trial court noted, "[T]rials are dynamic, as we know. They are ever-changing, and there could be something that comes out for us to revisit this if we need to," and it stated its rulings were thus "without prejudice." Thus, if defendant believed that portions of the women's testimony strayed too far beyond the facts of the underlying crimes or abuse, or if he believed that, given the dynamic and ever-changing nature of trial, their testimony was becoming too cumulative or too prejudicial, he could have objected, but he didn't. (See, e.g., *People v. Carrera* (1989) 49 Cal.3d 291, 321 ["the erroneous denial of an objection may, in a close case, warrant reversal, but that a case is close does not in and of itself excuse the failure to object or impose a duty on the trial court to intervene in the absence of objection"].)

The same goes for the videos. Indeed, the trial court specifically stated its ruling admitting the videos was "without prejudice to either" party and said, "I'm keeping it open subject to either of you folks making a further argument." After the prosecutor showed the first two videos to the jury, the court took a recess, dismissed the jury, and asked the parties if there was anything they needed to discuss. Defense counsel said nothing. When a district attorney investigator testified about the contents of other videos (and we acknowledge some of her testimony was extremely graphic), no objections were made. Accordingly, defendant's claims that specific items of evidence should have been excluded are forfeited.

b

*Remoteness*

Defendant argues the other acts were too remote to be probative. We disagree. Although there was a gap between the other offenses and the charged offenses, that is but one factor for the court to consider and it is not dispositive. In *People v. Robertson* (2012) 208 Cal.App.4th 965, 992, 994, for example, the court noted, " 'No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible,' " and it held a sexual assault that occurred 34 years before the charged sexual offense was not too remote and the trial court thus did not err in admitting evidence of it. The *Robertson* court also cited "[n]umerous cases" upholding the admission of prior sex offenses "that occurred decades before the current offenses." (*Ibid*.) Here, the gap is much shorter, and, as in *Robertson*, we conclude it was not so remote as to render the evidence inadmissible.

Moreover, and perhaps more importantly, this is not a case where there were substantial gaps between discrete incidents of abuse. L.W. testified the abuse occurred from 1996 to 2000; T.W. testified the abuse occurred from 2003 to 2007; defendant and the children lived with defendant's parents from approximately 2008 until January 1, 2016, which would have made abuse more difficult to commit for fear of getting caught;

41

and both children testified the abuse started while they lived with their grandparents and escalated when they moved.  The abuse in this case thus spans decades, punctuated by short gaps while defendant was between victims or had less opportunity to commit abuse.

c

*Lack Of Prior Conviction*

Defendant notes he was never prosecuted for or convicted of sex offenses or domestic violence involving L.W. or T.W., and there is thus a lower degree of certainty he actually committed those offenses.  It is true that when deciding whether to admit evidence of a prior offense, the trial court "must consider such factors as . . . the degree of certainty of its commission."  (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)  In this case, however, the trial court stated it "ha[d] considered . . . the degree of certainty of its commission" in deciding whether to admit the evidence.  The trial court noted L.W. and T.W. had never met and yet described "being subjected to identical forms of abuse," which tended to corroborate each woman's testimony and thus lead to a higher degree of certainty the abuse was committed as they described.  Moreover, some of the abuse described by T.W. was captured on video, which provided further corroboration.

Defendant similarly argues the fact he was never convicted of sex offenses involving L.W. and T.W. increases the prejudicial impact of their testimony because the jury might be tempted to convict him " 'to punish him for the uncharged acts, rather than because the evidence is sufficient to prove the charged crime.' "  (Quoting *People v. Kerley* (2018) 23 Cal.App.5th 513, 539.)  Again, however, the trial court appears to have considered this, and "[v]iewing the trial as a whole . . . it is unlikely that the jury would have been confused on whether it was deciding whether to convict" defendant for abusing his children as charged, or for abusing L.W. or T.W. years ago.  (*Ibid*.)  We discern no abuse of discretion in this decision.

d

*Burden On Defendant*

Defendant argues he and his counsel faced a significant burden defending against the other acts allegations, and doing so effectively "would have involved a time-consuming investigation and trial preparation process." We agree that defending against other acts can be burdensome. Presumably that is why Evidence Code sections 1108 and 1109 both require the prosecutor to disclose evidence of prior sex offenses or domestic violence at least 30 days prior to trial. (Evid. Code, §§ 1108, subd. (b), 1109, subd. (b); Pen. Code, § 1054.7.) Here, the prosecutor disclosed this evidence much earlier, giving defendant five months to prepare. We cannot say that this burden required the trial court to exclude the other acts evidence.

e

*Less Prejudicial Alternatives*

Finally, defendant argues there were less prejudicial alternatives to admitting *all* the challenged evidence, like admitting "some but not all" of his other offenses, or "excluding irrelevant though inflammatory details surrounding the offense[s]." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) We have already discussed this argument, above. We also note that the trial court and the prosecutor attempted to lessen the prejudicial effect of the videos by having a district attorney investigator describe them rather than play them for the jury. Indeed, the trial court initially *denied* the motion in limine as to the videos that contained "sexually graphic details" because it believed the prosecutor intended to show those videos to the jury. When the prosecution clarified it did not intend to show those videos to the jury, but only intended to have a district attorney investigator describe them, the trial court granted the motion and allowed the testimony. With no specific objections from defendant, we cannot say the trial court abused its discretion in failing to order the prosecutor to edit the videos or the district attorney investigator to stay away from particular details. (See *Haskell*, *supra*, 195 Cal.App.3d at p. 129.)

43

## D

*Defendant Has Not Demonstrated Prejudicial Error Resulted*

*From The Trial Court's Exclusion Of Impeachment Evidence Regarding T.W.*

Defendant's final argument is that, assuming the trial court properly admitted T.W.'s testimony, it should have permitted him to impeach her with (1) her former husband, who would have testified she falsely accused him of abuse and falsely accused others of rape; and (2) her grandmother, who would have testified T.W. had a character for untruthfulness. We conclude there was no error in excluding the ex-husband's testimony and any error in excluding the grandmother's testimony was harmless.

The trial court excluded the former husband's testimony as hearsay, conclusory, and under section 352, as requiring a trial within a trial. As to false allegations of rape against other people, we find no error in the trial court's finding that this would be inadmissible hearsay in light of defendant's failure to demonstrate T.W.'s former husband's personal knowledge of these claims. And defendant never mentions section 352 in this argument, much less convinces us the trial court abused its discretion in finding the impeachment evidence would necessitate an undue consumption of time.

Defense counsel made an offer of proof that T.W.'s grandmother would testify T.W. was "not truthful" and was "dishonest," and "that she has on multiple occasions made up false allegations against people." The trial court excluded the evidence, finding it inadmissible under section 787. Defendant argues this was error because section 787 was effectively repealed. (See Cal. Const., art. I, § 28, subd. (f)(2).) In *People v. Dalton* (2019) 7 Cal.5th 166, our Supreme Court held that an amendment to the California Constitution "abrogate[d] . . . section 787's prohibition on admission of specific instances of misconduct that are 'relevant only as tending to prove a trait of [a witness's] character.'" (*Dalton*, at p. 214.) As defendant accurately notes, "Evidence of a witness's character for truthfulness, or its opposition, is relevant to credibility and admissible for this purpose. (Evid. Code, § 780, subd. (e).) This evidence may be shown

44

by ' (a) evidence of specific instances of conduct, (b) opinion evidence, or (c) reputation evidence.' " (*People v. Bell* (2019) 7 Cal.5th 70, 106.) " 'An individual who has known a witness for a reasonable length of time or who knows the reputation of that witness for honesty and veracity in the community may qualify to testify as to the witness' character for honesty or veracity.' " (*Id*. at p. 107.)

Arguably, the grandmother's testimony was admissible to show T.W.'s character for untruthfulness. We agree with the People, however, that any error was harmless. The jury saw videos of defendant and T.W. that corroborated much of her testimony about defendant's abuse, and her grandmother's testimony that she was "dishonest" would not have markedly undermined her credibility. The same is true for T.W.'s former husband, who would have testified T.W. lied about his conduct during their relationship.

IV

*Insufficient Evidence Supports Two Of*

*Defendant's Convictions For Dissuading A Witness*

Defendant was found guilty of six separate counts of dissuading or attempting to dissuade a witness. Two of those counts—counts seventeen and twenty-one—were for violating Penal Code section 136.1, subdivision (b)(2), which prohibits the following: "[A]ttempt[ing] to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from" "[*c*]*ausing a complaint*, indictment, information, probation or parole violation *to be sought and prosecuted, and assisting in the prosecution thereof*." (Italics added.) Citing *People v. Reynoza* (2022) 75 Cal.App.5th 181, review granted May 11, 2022, S273797 (*Reynoza*), defendant argues there was insufficient evidence to convict him of these counts because the acts of dissuasion occurred *after* the complaint in this case had already been filed. We agree.

In *Reynoza*, a criminal complaint was filed in April 2017 against Rafael Cornejo, Francisco Rosales, and one other person for possession of a firearm, and all three defendants made several court appearances thereafter. (*Reynoza*, *supra*, 75 Cal.App.5th

45

at p. 184, rev. granted.)  On June 22, 2017, Cornejo had a confrontation with Raymond Reynoza (Rosales's brother) and two other men; one of the other men had attended the defendants' court appearance a few days earlier.  (*Id*. at pp. 183-184.)  According to witnesses, "Reynoza's group said something like, '[D]rop the charges,' and . . . , '[W]e don't fuck with snitches.' "  (*Id*. at p. 184.)  Reynoza was charged with witness dissuasion under Penal Code section 136.1, subdivision (b)(2), and the jury found him guilty.  (*Reynoza*, at p. 183.)  He appealed, arguing he could not have been guilty of attempting to dissuade Cornejo from causing a complaint to be sought and prosecuted because the complaint had already been filed.  (*Ibid*.)  The court agreed.  (*Id*. at p. 183-184.)

Again, Penal Code section 136.1, subdivision (b)(2) makes it a crime to attempt to prevent or dissuade a crime victim or witness from "[c]ausing a complaint . . . to be sought and prosecuted, and assisting in the prosecution thereof."  The *Reynoza* court held, "[T]he words '[c]ausing a complaint . . . to be sought' . . . refer to attempts to prevent a complaint from being filed.  If the defendant knows a complaint has already been filed and does not attempt to prevent or dissuade the witness from causing any further or amended complaint to be filed, an essential element of the offense is missing."  (*Reynoza*, *supra*, 75 Cal.App.5th at pp. 183-184, rev. granted.)  In reaching this conclusion, the court quoted approvingly from *People v. Brown* (2016) 6 Cal.App.5th 1074, which held in dicta, " '[U]nder [Penal Code] section 136.1, subdivision (b)(2), the perpetrator must attempt to prevent a person from causing a charging document to be sought and prosecuted and from assisting in the prosecution.  Thus, *the prevention must occur before the relevant charging document has been filed*.' "  (*Reynoza*, at pp. 187-188, italics added, quoting *Brown*, at p. 1082.)[7]

---

[7]    This issue is currently pending before our Supreme Court, which has granted review in *Reynoza* to address whether Penal Code section 136.1, subdivision (b)(2) "encompass[es] attempts to dissuade a victim or witness after a charging document has

46

According to the *Reynoza* court, "There are still some circumstances under which a person can violate [Penal Code] section 136.1[, subdivision ](b)(2) even if the charged conduct occurs entirely after the filing of a charging document," for example, if the defendant did not know a complaint had already been filed, or if the defendant knew a complaint had been filed and "attempt[ed] to dissuade a witness . . . from causing an amended complaint or some other subsequent charging document" from being filed. (*Reynoza*, *supra*, 75 Cal.App.5th at p. 189, rev. granted, italics omitted.) In *Reynoza*, however, "There was no evidence Reynoza was unaware the complaint had been filed; to the contrary, the evidence tended to show he was aware of the complaint and subsequent court proceedings. Nor was there any evidence he intended to prevent or dissuade the witness from causing an amended complaint or other charging documents to be filed." (*Id.* at p. 187.) The court thus reversed Reynoza's conviction for dissuading a witness pursuant to Penal Code section 136.1, subdivision (b)(2). (*Reynoza*, at p. 190.)

Defendant's case is similar. The complaint was filed on May 2, 2019. It did not originally include the two challenged counts (counts seventeen & twenty-one) for dissuading a witness. Those counts were added later, based on the allegation that, "[o]n or about and between September 1, 2019 and September 18, 2019," i.e., four months *after* the complaint was filed, defendant violated Penal Code section 136.1, subdivision (b)(2) by attempting to dissuade his daughter (count seventeen) and his son (count twenty-one) "from causing a complaint . . . to be sought and prosecuted and assisting in the prosecution thereof." As in *Reynoza*, defendant argues this conduct does not violate Penal Code section 136.1, subdivision (b)(2) because it all occurred *after* the complaint

been filed." (California Supreme Court, *Issues Pending Before the California Supreme Court in Criminal Cases* (Jan. 26, 2024) at p. 5, <https://supreme.courts.ca.gov/sites/default/files/supremecourt/default/2024-01/pendingissues-crim%20-%200126240.pdf> [as of Jan. 29, 2024] archived at <https://perma.cc/ZYR2-LPPV>; see *Reynoza*, *supra*, 75 Cal.App.5th 181.)

was filed, and there is no suggestion that he was unaware of the complaint or that he intended to dissuade the children from causing an amended complaint to be filed. We agree.

The People tacitly acknowledge the evidence is insufficient to show defendant attempted to dissuade the children from causing a complaint or an amended complaint to be filed. Instead, they contend the evidence shows defendant attempted to dissuade his children from assisting in the prosecution of the complaint, and they cite *People v. Velazquez* (2011) 201 Cal.App.4th 219 to support their argument that this is sufficient to support a conviction under Penal Code section 136.1, subdivision (b)(2). The *Velazquez* court held the provision "includes attempts to dissuade a victim from causing a complaint or information to be prosecuted *or assisting in that prosecution*. The evidence in this case shows that [the] defendant threatened [the victim] in an attempt to persuade her to drop the charges against his fellow gang members. This is sufficient evidence to support a conviction under [Penal Code] section 136.1, subdivision (b)(2), for attempting to dissuade a victim from causing a complaint or information to be prosecuted." (*Velazquez*, at p. 233, italics added.)

The *Reynoza* court disagreed with *Velazquez* based on the plain language of the provision. The *Reynoza* court held, "The *Velazquez* court misconstrued the term 'and' to mean 'or,' thereby eliminating that required filing element. By passing over the drafters' use of the conjunctive rather than the disjunctive, the court ignored the canon of statutory construction that ' "significance must be given to every word [in a statute] in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage." ' " (*Reynoza*, *supra*, 75 Cal.App.5th at p. 188, rev. granted.) The People argue *Reynoza* was wrongly decided, and we should decline to follow it. We are not persuaded and adopt the *Reynoza* court's interpretation of Penal Code section 136.1, subdivision (b)(2) based on the plain language of the section. Accordingly, defendant's convictions on counts seventeen and twenty-one must be reversed.

48

## V

### *Remand Is Required*

Defendant argues his sentence on several counts must be stayed pursuant to Penal Code section 654, which provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Pen. Code, § 654, subd. (a).) This provision "bars the imposition of multiple sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code." (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1413.) Penal Code section 654 only bars multiple *punishments* for a single act; it does not bar multiple *convictions* for a single act. (*People v. Mesa* (2012) 54 Cal.4th 191, 195.)

Penal Code "[s]ection 654 has long been interpreted to preclude multiple punishments not only for a single act that violates more than one statute, but for *an indivisible course of conduct*. [Citation.] Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of [Penal Code] section 654 depends on the intent and objective of the actor. [Citation.] '[I]f all of the offenses were merely incident to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once.' " (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1042-1043, italics added.) "Whether multiple convictions are based upon a single act [or indivisible course of conduct] is determined by examining the facts of the case." (*People v. Mesa*, *supra*, 54 Cal.4th at p. 196.) Where, as in this case, the trial court did not refer to Penal Code section 654 during sentencing, "we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying [Penal Code] section 654 or not applying it" and we "affirm the sentence if an implied finding that [Penal Code] section 654 does not apply is supported by substantial evidence." (*Mejia*, at p. 1045.)

49

Defendant was convicted in count one for attempted torture of his children, in count three for assaulting his daughter with a deadly weapon, count seven for assaulting his son by means of force likely to produce great bodily injury, and in counts five and eight for child abuse of each of his children. The trial court sentenced defendant consecutively on each count. Defendant contends the attempted torture conviction is based on the same course of conduct as the two child abuse convictions and includes the acts underlying the two assault convictions. He argues Penal Code section 654 thus prohibits the imposition of unstayed sentences both for torture and for child abuse and the assault.

The People agree in part. They agree defendant's sentence on the two child abuse counts must be stayed because "the record evidences no distinction in [defendant's] intent and objective for the attempted torture count and these two child abuse counts." We accept the People's concession. As alleged in the information, the attempted torture and the child abuse both occurred "between February 4, 2019 and March 2, 2019." February 4, 2019, is the approximate date of the Wattpad incident, when both children testified defendant beat them and yelled at them for hours, and March 2, 2019, is the date the children were removed from the home. During closing argument, the prosecutor relied on defendant's course of conduct following the Wattpad incident to prove both the attempted torture charge and the child abuse charges alleged in counts five and eight. Thus, the convictions are based on the same indivisible course of conduct, and either the sentence on count one or the sentences on counts five and eight must be stayed.

This leaves the two assault counts. Both assaults allegedly occurred "[b]etween February 4, 2019 and February 6, 2019." Count three involved defendant's daughter and was for assault with a deadly weapon. During closing argument, the prosecutor stated this count was based on the "steak knives," and the evidence that defendant was "chasing her with the knife, then she's down on the ground trying to scoot away from him, and he is not stopping." As noted above, defendant's daughter testified that when defendant

50

discovered the children's social media accounts, he "grabbed a steak knife and pointed it at [her] while [she] was on the ground and told [her she] need[ed] to tell him whether there were any other online accounts." She testified defendant "chased" her with the knife while she "was on the ground scooting away from him."

Count seven involved defendant's son and was for assault by means of force likely to produce great bodily injury. During her closing argument, the prosecutor relied on defendant's son's testimony about "being stomped during the Wattpad incident. He was kicked. He was stomped. That is what this count goes to."

Defendant argues these two assaults were part and parcel of the beating the children received the day of the Wattpad incident, which is also the basis for the torture and child abuse counts. We agree. Penal Code "section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element." (*People v. Mejia*, *supra*, 9 Cal.App.5th at pp. 1044-1045.) The sentence for the two assault counts or the sentence for the attempted torture thus must be stayed.

Defendant further argues that the two dissuasion counts we conclude are unsupported by the evidence are based on the same conduct as other dissuasion counts, and thus the trial court was required to stay imposition of sentence on two of his dissuasion convictions. Because we have concluded the evidence was insufficient as to the dissuasion convictions defendant compares to his other convictions, we need not address this argument.

## DISPOSITION

Defendant's convictions on counts seventeen and twenty-one are reversed. The matter is remanded for the trial court to exercise its discretion pursuant to Penal Code section 654 as stated in section V of this opinion. In all other respects the judgment is affirmed.

/s/
ROBIE, Acting P. J.

We concur:

/s/
BOULWARE EURIE, J.

/s/
WISEMAN, J.*

---

*        Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.